# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 6, 2014 Session

## ANTHONY BOYLAND v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 07-04685   Lee V. Coffee, Judge**

---

**No. W2013-01226-CCA-MR3-PC - Filed August 4, 2014**

---

The Petitioner, Anthony Boyland, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions for first degree felony murder, aggravated assault, and aggravated burglary and his effective life sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Lance R. Chism (on appeal) and James Prentice DeRossitt, IV (at hearing), Memphis, Tennessee, for the appellant, Anthony Boyland.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Susan Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court summarized the facts of the Petitioner's crimes in his appeal of the convictions:

> On the morning of February 13, 2007, Starkeshia Swift, Curtis Bonds, Marcus Kuyendall, and Joesette Carter returned to Ms. Swift's apartment to find the defendant hiding in a bedroom closet. An argument concerning the defendant's unwelcome presence quickly evolved into a physical confrontation between the defendant and Mr. Bonds in the living room of the apartment. At

one point, the defendant retreated to the bedroom, returned to the living room armed with a knife, and stabbed Mr. Bonds. The defendant continued his pursuit of Mr. Bonds outside the apartment as the others attempted to flee. The defendant, still armed with a knife, then turned to Ms. Swift and engaged her in a confrontation during which Ms. Swift suffered a severe cut to her thigh. The defendant eventually fled the area on foot. Ms. Swift and Ms. Carter found Mr. Bonds lying in the parking lot, bleeding severely from his wounds. Mr. Bonds died a short time later as the women waited for the police and ambulance to arrive. Ms. Swift was transported via ambulance to a local hospital where she received nine staples to treat the wound to her leg.

The defendant turned himself in to the police within hours of the incident. In his statement to the police, the defendant admitted hiding the knife in the mattress of a bed, but he claimed that he had acted in self-defense. The defendant received no bruises or abrasions of any kind from the incident.

Starkeshia Swift testified that she and the defendant had a child together, but they had broken up in 2006 when their son was two-years-old. Following their breakup, Ms. Swift did not maintain direct contact with the defendant and, in fact, had obtained a restraining order against him. She did, however, allow the defendant a relationship with his son through the assistance of the defendant's mother. Ms. Swift said that she never gave the defendant a key or invited him to her apartment. She said that the defendant was not welcome in her apartment. The defendant had never fought Messers Bonds or Kuyendall at any time before this date. She maintained that no one had initiated a fight with the defendant or prevented him from leaving the apartment on the day of the incident. Likewise, neither she nor her friends were armed at any time during the incident.

After visiting at her mother's home on the night of February 12, Ms. Swift and her friends returned to her apartment. As they walked down the hallway to her bedroom, Mr. Bonds entered the room first and opened the closet door to discover the defendant inside. When Ms. Swift saw the defendant leaving the closet, she immediately returned to the living room where she could telephone the police "[b]ecause [the defendant] wasn't supposed to be in [her] house." As Ms. Swift spoke to the 9-1-1 operator, she turned to see the defendant and Mr. Bonds fighting. Initially, neither the defendant nor Mr. Bonds had any weapons. The defendant, however, retreated to the bedroom and soon returned to the living room armed with a knife. The defendant pushed Mr. Bonds into a china cabinet and "stuck" him.

-2-

Ms. Swift, who was "in shock" when she saw the defendant stab Mr. Bonds, quickly ran to the door and unlocked the deadbolt so that they could all escape. She recalled that Mr. Bonds ran out, followed by Mr. Kuyendall and Ms. Carter. Ms. Swift tried to run out onto the threshold stair landing, but the defendant "came after" her and "stuck" her in the leg. Mr. Bonds, who saw the defendant fighting Ms. Swift, yelled for the defendant to stop. The defendant then ran to Mr. Bonds and fled the apartment complex parking lot on foot. Ms. Swift and Ms. Carter drove to the entrance of the apartment complex to find Mr. Bonds lying in the street in a pool of blood. A neighbor gave Ms. Carter a towel, and she attempted to apply pressure to Mr. Bond's wound to stop the bleeding. He died before the ambulance arrived.

Joesette Carter testified consistently with Ms. Swift's account of the incident. She also recalled that she went to the kitchen when they first arrived at the apartment. She said that she had given Ms. Swift a knife set and that when she looked in the kitchen drawer that morning, "every last one" of the knives was gone. When she heard the defendant and Mr. Bonds arguing in the hallway, she just "froze up." Ms. Carter recalled that the argument escalated into a fight within a minute. She heard the defendant say to Mr. Bonds, "[B]itch, you want to f*** with me." Soon thereafter, she heard the defendant stab Mr. Bonds. She said that "everything happened fast."

On February 13, 2007, Memphis Police Department (MPD) Officer Victor Lester responded to a call at the Ridgecrest Apartments concerning a "boyfriend who refused to leave" the caller's apartment. When Officer Lester arrived, he found Mr. Bonds lying in the street in a puddle of blood while Ms. Carter and Ms. Swift attempted to control the bleeding with a towel. Officer Lester recalled that Mr. Bonds "didn't appear to be breathing and his eyes had turned in his head." He said that "when [Ms. Carter] removed the towel[, Mr. Bonds] was out of blood." An ambulance soon arrived and attempted to resuscitate Mr. Bonds without success.

Both Ms. Carter and Ms. Swift told Officer Lester that the defendant had stabbed Mr. Bonds. Officer Lester issued a "BOLO" (be on the lookout alert) containing the defendant's description and information that he was armed with a knife. Approximately two hours later, the defendant's "auntie" telephoned the police and told them that the defendant wanted to turn himself in. The defendant was arrested without incident that afternoon. He told officers that he had disposed of the knife near the apartment complex. When officers searched the area, however, they did not recover the knife. Officer

Lester recalled that the defendant was calm and did not have any physical indicia of having been in a fight earlier that day.

MPD Officer Darron Smith arrived at the apartment complex a short time after Officer Lester. He recalled that Mr. Bonds was "lying in the parking lot" and "was pretty much deceased" at the time he arrived. Officer Smith assisted in the defendant's arrest later that afternoon. He described the defendant as "slightly nervous" yet "rather polite." He said that the defendant was "very cooperative and gave us no problem."

MPD Sergeant Anthony Mullins, a member of the homicide bureau, arrived at the apartment complex after Mr. Bonds and Ms. Swift were transported to the hospital. He secured the scene and evidence and then went to the hospital to collect evidence from Mr. Bonds. He recalled collecting Mr. Bonds's clothing and said that it was "so bloody" that it had to be taken to a special facility to be dried.

Sergeant Mullins assisted in questioning the defendant later that day. He recalled the circumstances of the defendant's execution of his waiver of rights and that the defendant had some difficulty reading the form. Sergeant Mullins said, however, that the defendant indicated his understanding of each right by initialing each prior to signing the waiver. The defendant appeared calm with a "very even temperament" throughout the interrogation. Sergeant Mullins said that his previous assignment as a crisis officer had given him experience with individuals suffering from chemical dependency or mental health issues and that the defendant exhibited no signs of distress or lack of understanding. He testified that he would have stopped an interrogation if he suspected a defendant had "mental issues, learning disabilities, [or] ... [was] not really understanding." The defendant gave a statement which was transcribed. Following the interrogation, the officers read the statement to the defendant. The defendant signed the statement, acknowledging it as his account of the incident.

MPD Sergeant David Parks acted as case coordinator over the investigation of the incident. As case coordinator, he assigned officers various tasks, including canvassing areas where the defendant might be in an effort to locate him for questioning. To this end, the officers spoke with several of the defendant's family members in the hours following the incident. Sergeant Parks said that the defendant turned himself in and was brought to the police station later that afternoon. He described the defendant as "calm under the

circumstances. It was obvious he realized what he had done[,] but he was calm."

Sergeant Parks said that the defendant signed a waiver of his rights after being provided *Miranda* warnings and confessed to stabbing Mr. Bonds and Ms. Swift. The defendant told Sergeants Parks and Mullins that Ms. Swift asked him to come to her apartment to clean it. He arrived on the afternoon of February 12 and stayed overnight while Ms. Swift and the others were gone. The defendant said that when the group discovered him at the apartment the next morning, Mr. Bonds told the defendant that he was not supposed to be there. The defendant said that he thought Mr. Bonds was walking away when suddenly Mr. Bonds hit him. The two began to fight. The defendant ran to the bedroom to get the knife that, he explained, he had put under the mattress the night before "in case [Ms. Swift] came back with anybody ... being safe." The defendant then "stuck" Mr. Bonds with the knife. The defendant said that Ms. Swift attempted to stop him from leaving the apartment, so he swung the knife and cut her leg. In summary, the defendant claimed that he "was just defending himself."

Sergeant Parks testified that the defendant could have stopped the interrogation at any time but did not do so. Furthermore, he could have "walked away" from the statement, but he initialed each page and signed it instead. Sergeant Parks said that the defendant had a basic understanding of "what was going on" during the interrogation. Lieutenant Walter Davidson read the statement to the defendant because the defendant told the officers that he could not read well. Lieutenant Davidson recalled that the defendant understood "everything."

Doctor Lisa Funte, a forensic pathologist with the Shelby County Regional Forensic Center, performed the autopsy of Mr. Bonds. She determined that Mr. Bonds died from a stab wound to his right shoulder that penetrated into his chest cavity, through his lung and near his heart. Additionally, Mr. Bonds suffered a perforating wound to his right arm and several abrasions. Although Mr. Bonds's toxicology report revealed the presence of marijuana, Doctor Funte testified that the amount was "barely above the detectable level" and would not "have [had] much effect on [Mr. Bonds] at all."

. . . .

Barbara Faulkner, manager of the Ridgecrest Apartments, testified that Ms. Swift's tenant file showed that Ms. Swift requested both mailbox keys and apartment keys on five separate occasions in 2007. She further testified, however, that the first request was made in May 2007, almost three months after the stabbing. The defendant recalled as a witness Ms. Swift who testified that the defendant did not have a key to her apartment. She admitted, however, that she had lost a key and asked for a replacement sometime in 2007.

Cleetris Boyland, the defendant's mother, testified that the defendant was "very slow" and could not comprehend things well. She said that he was diagnosed with mild mental retardation at the age of three. The defendant graduated at the age of 18 with a special education diploma and maintained employment as a grocery sacker for a period of time after graduation. When she learned from her sister that the defendant had been involved in a fight and that the police were looking for him, she went to her sister's home where the defendant later turned himself in to the police. She recalled that the officers "put [the defendant] in the car and told [her] that [she] didn't have to worry about him, he'd be okay." No one asked Ms. Boyland anything concerning the defendant's intellectual ability.

Doctor Joseph Charles Angellilo, a forensic psychologist, testified that the defendant's educational records revealed an intelligence quotient (IQ) of 56 at age 10. Testing performed by Doctor Angellilo when the defendant was 25 years old revealed an IQ of 53. Doctor Angellilo opined that the defendant's immediate memory was "not so great." On cross-examination, he admitted that the defendant's concealing the knife in the mattress showed a higher level of cognition and required some planning.

*State v. Anthony Boyland*, No. W2010-00677-CCA-R3-CD, slip op. at 1-6 (Tenn. Crim. App. June 21, 2011) (footnotes omitted), *perm. app. denied* (Tenn. Oct. 18, 2011).

At the post-conviction hearing, the Petitioner testified that he chose not to testify at his trial. He understood that if granted post-conviction relief, he would have the choice whether to testify at a new trial.

The Petitioner testified that he had a low IQ and agreed his mental state was an issue in the conviction proceedings. He said he did not understand the meaning of "competent" but agreed the trial judge determined that he was competent to stand trial. He said he "did not know how to say" why trial counsel was not a good attorney in his case.

On cross-examination, the Petitioner testified that he did not remember how long he worked with trial counsel before the trial. When asked if he could indicate the ways in which counsel performed deficiently, he said he could not. He said another inmate helped him draft his post-conviction petition.

On questioning by the trial court, the Petitioner testified that he graduated from a special education program in 2003. He recalled the school had a male principal but did not remember the man's name.

The Petitioner testified that he remembered "a little" when an assistant public defender was appointed to his case. He said she was relieved of representation after she told the judge she did not know how to handle the case. He agreed trial counsel represented him for a while before the trial. He agreed an inmate told him to file a post-conviction claim against his attorney and helped him prepare the petition. When asked to identify the reasons he did not think counsel did a good job, he said she was busy when he wanted to see her. He said he wanted information about his case. He said counsel saw him in jail "[a]t least three or just a couple of times, but it wasn't a lot." He said his attorneys never gave him any paperwork about the State's evidence, police reports, or witness statements. He identified papers he had in the courtroom as the trial transcript, which he received from post-conviction counsel. He said he asked trial counsel for a copy of the transcript, but she never provided it. He said he needed the transcript because he did not understand what occurred during the trial. He acknowledged he did not tell the trial judge that he did not understand what was occurring.

The Petitioner testified that trial counsel had two doctors talk to him. He agreed that the trial court conducted a hearing and that the court determined he "understood everything." He did not remember if he gave counsel the names of possible defense witnesses but said she called defense witnesses at the trial. He agreed, though, that she would have known of the witnesses because he or someone else identified them to her. He said he wanted "[t]he people that was at Ridgecrest when I caught my case" to testify. He said that he could not identify anyone by name but that he had given the information to counsel. He agreed the witnesses to the stabbing did not testify.

The Petitioner testified that trial counsel "could fight harder" for him. He acknowledged he was unhappy with his first degree murder conviction and thought he should have received a more favorable result. He agreed counsel was appointed and worked on his case for over a year before the trial. He agreed counsel sought and obtained a mental health evaluation based upon his history of special education classes. He said counsel did not spend enough time with him on his court dates.

On redirect examination, the Petitioner testified that trial counsel did not provide him with pretrial discovery. He agreed he gave post-conviction counsel a note written by another inmate regarding pretrial discovery.

Cleetris Boyland, the Petitioner's mother, testified that the Petitioner was twenty-seven years old and that he had always lived with her until his incarceration. She said that as a child, the Petitioner could not do the same things as other children his age. She said he had language deficits at four or five years old. She said that she had him evaluated by doctors with the Memphis schools and the Social Security Administration and that he was diagnosed with a disability. She said he did not understand things and that things had to be explained to him using small words. She agreed the trial proof showed that the Petitioner's childhood IQ was fifty-six and that his IQ at the time of the trial was fifty-three.

Ms. Boyland testified that she worked with trial counsel in the months leading up to the trial. She said counsel told her things to tell the Petitioner. She said the Petitioner trusted counsel. She said he did not want to talk to anyone other than counsel about his case. She said that she told the Petitioner things counsel said but that the Petitioner told her she did not know the law. She said the Petitioner wanted to hear it from counsel, not her. She said the Petitioner did not think counsel was doing her job when he could not get in touch with counsel. She said the Petitioner called her every other day stating he needed to talk to counsel. She said the Petitioner's childlike state affected his trust in counsel. She agreed the Petitioner completed his special education program because she made sure he kept attending. She said the Petitioner loved school and learning. She agreed the Petitioner was not competent.

On cross-examination, Ms. Boyland stated that she testified at the Petitioner's competency hearing and trial. She remembered trial counsel's having talked about "some people" but did not remember if counsel said she had several witnesses prepared to testify. She agreed counsel was in contact with her during the trial and appellate processes. She said that counsel sent the Petitioner a letter advising him on further action he might take and that the Petitioner sent the letter to her. She said it was better to talk to her because the Petitioner did not understand. She did not recall whether counsel's advice was to seek post-conviction relief with a new attorney.

On questioning by the trial court, Ms. Boyland testified that trial counsel worked on the Petitioner's case and kept in contact with her in order for Ms. Boyland to provide information to the Petitioner. She said, though, that counsel should have stayed in contact with the Petitioner. She said she could not answer the Petitioner's questions. She said she met with counsel three or four times. She agreed counsel told her about the State's evidence, the State's theory, and the defense theory. She agreed counsel pursued a competency

hearing. She thought counsel should have obtained a shorter sentence for the Petitioner. She agreed counsel did the best she could to present a defense to the charges. She said she gave counsel all the information she had that might help the defense. She could not identify anything counsel could have done to make a difference in the Petitioner's case. She said that after the case was over, counsel checked the Petitioner's welfare.

Trial counsel agreed that she was appointed to represent the Petitioner around July 24, 2008. She agreed she filed a discovery motion, a motion in limine to exclude the Petitioner's prior bad acts, a notice of mental disease or defect, a request to determine competency, and requests for special jury instructions. She agreed the court denied her requests for special instructions on diminished capacity, self-defense, and "imperfect self-defense."

Trial counsel testified that she was the Petitioner's second attorney. She said it was apparent at the beginning of her representation that the Petitioner's competency was an important issue. She said the Petitioner was evaluated by Dr. Joseph Angelillo, who testified at the competency hearing and the trial. She agreed with the Petitioner's mother's post-conviction testimony that the Petitioner had prior mental evaluations by the Memphis schools and the Social Security Administration. She said the Petitioner's IQ had decreased from seventy-two to fifty-three with age. She agreed that at age twenty-five, his ability to "sound out" words was that of a six-and-one-half-year-old. She agreed his ability to comprehend written passages was that of a person who was 6.1 years old with a grade equivalent of "eight months into kindergarten." She agreed his arithmetic ability was equivalent to that of a seven-year-old with a grade equivalent of "eight months into his first-grade year." She agreed the State's expert was Dr. William Fulliton. She said both experts agreed about the Petitioner's mental retardation,[1] although the State contended the Petitioner was competent despite his mental retardation. She said it was difficult to obtain a clear diagnosis from an expert. She said an expert would testify about the tests administered and results obtained.

Trial counsel testified that according to Dr. Angelillo's testimony, the Petitioner's lack of comprehension showed diminished capacity. She agreed she sought a jury instruction on diminished capacity. She said the diminished capacity statute provided that it could apply if there was evidence of mental retardation. When asked about the trial court's statement's in the trial record that diminished capacity was not mentioned at the competency hearing, she said that after significant preparation and Dr. Angelillo's evaluation, she decided to focus in the competency hearing on the Petitioner's deficits in functioning and comprehension. She said that strategically, she thought she "had everything out" that she needed to pursue a

---

[1] We note that on April 9, 2010, the General Assembly ordered all references to "mental retardation" in Tennessee Code Annotated to be changed to "intellectual disability." *See* 2010 Tenn. Pub. Acts 734. The testimony of the witnesses is provided here as given.

diminished capacity defense. She said the court's order regarding competency stated that the Petitioner was competent to stand trial and that there was no insanity issue. She said, "That's what [the court] used, which is not what I was arguing and not the proof that I had presented during the hearing[.]"

Trial counsel testified that she did not file a motion to suppress the Petitioner's statement. She said she chose, as a matter of strategy, to argue that the Petitioner was not competent to stand trial. She said the police officers who testified thought the Petitioner was competent. She agreed Dr. Angelillo testified that the Petitioner had a very limited understanding of the proceedings. She agreed that when Dr. Angelillo asked the Petitioner what a judge was, the Petitioner could only explain, "He's the one who wears the robe." She agreed that both mental health experts testified that the Petitioner had difficulty knowing counsel's name. She agreed the Petitioner did not have a good idea what a criminal prosecution was. She said Dr. Angelillo testified at the competency hearing that sentences needed to be simple for the Petitioner to understand them. She said that Dr. Angelillo gave the Petitioner a test relative to his understanding of the *Miranda* warnings, that the warnings were broken down into small sentences, and that the Petitioner had a very low score. She said the officers testified at the trial that they "did cut it into little pieces" when they advised the Petitioner of his *Miranda* rights.

On cross-examination, trial counsel testified that she viewed diminished capacity as "kind of bound together with" her motion to determine the Petitioner's competency. She agreed she was surprised that the Petitioner decided to testify. She agreed the Petitioner probably did not understand what was said in court.

Trial counsel testified that Dr. Angelillo stated at the competency hearing that he could use medical terms but not legal terms. She said he testified in descriptive terms about the Petitioner's diminished capacity but could not use the legal term. She said Dr. Angelillo testified in descriptive terms about the Petitioner's mental retardation because it was a component of the proof of diminished capacity. When asked if she thought the judge misunderstood her arguments, she said she thought the competency and diminished capacity issues were confusing for everyone involved. She said that although Dr. Angelillo testified at the competency hearing about the Petitioner's mental retardation, the judge said the issue had not been raised. She agreed she filed a notice of mental disease or defect and a notice of intent to offer expert proof on the issue. She said that she requested jury instructions on self-defense, "passion language," and lesser included offenses and that she requested instructions during the sentencing phase on reduced culpability due to mental disease or defect. She said, "I tried to go each and every route I could find." She said the Petitioner's mental disease or defect was her "main theme" in the trial and the appeal. She said she filed an application for permission to appeal to the Tennessee Supreme Court, but it was denied.

-10-

She said that at that point, she told the Petitioner's mother that a post-conviction petition alleging that counsel did something wrong was the only remaining avenue for relief.

Trial counsel testified that every time she spoke with the Petitioner, she reiterated what she had said to his mother. She said they worked together to explain things to the Petitioner. She said she did not feel like the Petitioner understood things and needed his mother's help. She said that she also used her investigator to reinforce things with the Petitioner.

Trial counsel testified that although she did not know how many times she visited the Petitioner, it was more than three. She said she and her investigator made numerous jail visits to prepare for the competency hearing. She said it took her a long time to gain the Petitioner's trust and that she had to explain to him repeatedly that he should cooperate with the doctor who would visit him. She said that after the appeal, she continued to talk to the Petitioner's mother because the Petitioner did not understand things. She said that "at the end," she sent a "package" to the Petitioner and sent a copy of the letter to the Petitioner's mother.

Trial counsel testified that when she was appointed, the Petitioner's previous attorney had given the Petitioner a copy of the discovery materials. She said she gave the Petitioner copies of her investigator's reports and that she explained and reviewed the documents with him. On questioning by the trial court, counsel agreed that she did everything she could to convince the trial judge to give a diminished capacity instruction. The court received as exhibits pleadings filed by counsel and documents related to the appeal.

After receiving the proof, the trial court found that the Petitioner failed to articulate any reasons why trial counsel was ineffective. The court found that counsel was "one of the most meticulous, . . . persistent, . . . conscientious, [and] professional attorneys" in Shelby County. The court found that counsel filed all possible motions, had the Petitioner evaluated for competency, and presented proof and argument at a competency hearing. The court noted that the order finding the Petitioner competent was filed on November 16, 2009, and that the trial began on November 20, 2009. The court stated that counsel filed proper motions and notices, that they were not addressed by the trial judge, and that the judge decided not to hear them when they were brought to her attention on the trial date. The court found that implicitly, the trial judge found that diminished capacity did not apply. The court found that despite law requiring an expert to state that a defendant was incapable due to mental disease or defect of forming intent, the trial judge allowed Dr. Angelillo to testify even though Dr. Angelillo did not state that the Petitioner was incapable of forming the intent for first degree murder. The court noted this court's determination in the previous appeal that evidence of diminished capacity was properly excluded. The court found that the Petitioner had not

offered proof at the post-conviction hearing of the Petitioner's lack of capacity to form the intent for the crimes and declined to speculate about what non-testifying witnesses might have said.

Regarding trial counsel's decision not to file a motion to suppress, the trial court found that the Petitioner's pretrial statement was "largely" exculpatory and did not damage the defense. The court noted that the officers who took the statement did not question the Petitioner's competency and that there were no defense witnesses who could have testified at the suppression hearing. The court found that counsel made a strategic decision not to file a motion to suppress and that the statement was the only way to show the jury the Petitioner's version of events.

The trial court noted the overwhelming evidence of the Petitioner's breaking into the house where the crimes occurred, lying in wait, and attacking a person who tried to intervene during his attack on the victim. The court noted that the trial court gave a self-defense but not a diminished capacity instruction. The court found that trial counsel did everything she could but that the jury rejected the defenses raised.

The trial court found that the Petitioner's testimony about his having never really talked to trial counsel was not credible. The court found that counsel visited the Petitioner many times in jail and on court dates and that she was in "constant communication" with the Petitioner's mother.

The trial court found that the Petitioner was "more than adequately" represented by trial counsel. The court denied the petition for post-conviction relief. The findings and conclusions in the trial court's written order were consistent with its ruling from the bench. This appeal followed.

**I**

The Petitioner contends that trial counsel was ineffective for failing to file a motion to suppress his statement based upon his inability to knowingly, intelligently, and voluntarily waive his *Miranda* rights. The State contends that the record supports the trial court's determination. We conclude that the Petitioner is not entitled to relief.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's

conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner argues that although trial counsel focused on challenging the Petitioner's competency to stand trial, she "simply overlooked" filing a motion to suppress the pretrial statement. He argues that had the motion been filed, his statement would have been suppressed. He also argues that without his statement in evidence, a reasonable probability exists that the outcome of his trial would have been different because the statement provided the only evidence the Petitioner hid a knife under a mattress. He also notes that the statement referred to an altercation he had with Ms. Swift the night before the crimes.

When asked at the post-conviction hearing if she filed a motion to suppress, trial counsel said, "No. That motion was based on what the ruling for competency was going to be." When asked why she would "hinge filing a motion to suppress on the ruling on the competency issue," counsel explained:

Because from the very beginning, I found that [the Petitioner] was not competent to stand trial. That was my defense attorney analysis of my case. I tried to go that route, so it was strategy. I mean, based on the evidence that I had gathered, I thought that [the Petitioner] should not have gone to trial; therefore, I did everything that I could to follow that direction.

The statement issue was addressed with the officers during the trial, and I don't remember exactly what the proof was with the officers, but they found him competent, according to their testimony, because they have [a] tendency to mark . . . the level of competency on the right corner of the statement. So there was no issue – they didn't find – nobody found any issue with his competency.

She agreed that in Dr. Angelillo's opinion, the Petitioner was unable to understand the *Miranda* warnings in the standard form they were given and that the sentences needed to be simplified for his benefit. On cross-examination, counsel explained further, "[I]f you ask why I didn't file a specific motion for suppression was because it was kind of bound together with my motion of competency. I did make those requirements of Dr. Angelillo to ask [a] specific question as to the validity of his understanding for a *Miranda* warning, for giving a statement."

In its order denying post-conviction relief, the court found:

Trial counsel testified that her strategy hinged on the contested competency ruling. There was no expert testimony presented at the competency hearing that conclusively established that the defendant was actually mentally retarded and therefore *unable* to effectively waive his rights. There was no expert proof presented at the trial or at the evidentiary hearing that established that the petitioner could not have knowingly understood and waived his rights. The statement given by the petitioner was largely exculpatory and attempted to establish self-defense. As trial counsel had no other witnesses who could establish self-defense, trial counsel [made] a strategic decision not to file a motion to suppress after the trial judge determined that the petitioner was indeed competent. No expert proof has ever been presented that conclusively shows that the defendant is mentally retarded/intellectually disabled to the extent that the petitioner could not understand and knowingly waive his *Miranda* rights.

The court credited trial counsel's testimony. It found that counsel provided effective assistance and that the Petitioner was not entitled to relief.

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Trial counsel explained that she thought the Petitioner was not competent to stand trial and chose, as a matter of trial strategy, to focus on challenging his competency for a trial. She also testified that she attempted to present a diminished capacity defense, and despite the trial court's rulings limiting her ability to pursue diminished capacity, she was able to present Dr. Angelillo's testimony at the trial about the Petitioner's mental capacity.

In determining whether trial counsel's decision was an informed one, we have reviewed the Petitioner's statement, in which he acknowledged stabbing the victim during an altercation and cutting Ms. Swift during the altercation with the victim, and the law related to suppression of confessions. In the statement, the Petitioner said that he argued with the victim and that the victim struck him first. The Petitioner said that after the altercation began, he retrieved a knife he put under a mattress previously. He argues that the statement provided the only evidence he hid the knife before the altercation and that it contained references to an altercation the Petitioner had with Ms. Swift the previous night.

The trial court's post-conviction order focused on the prejudice prong and did not address whether counsel's performance was deficient. *See Strickland*, 466 U.S. at 687. Regarding deficient performance, we note the evidence from multiple witnesses of the Petitioner's cognitive function. This evidence was relevant to the Petitioner's ability to understand his *Miranda* rights and to whether he could knowingly, voluntarily, and understandingly waive his rights. Trial counsel's filing a motion to suppress would not have precluded her from challenging his competency to stand trial and pursuing a diminished capacity defense if the motion to suppress and competency hearing rulings did not favor the defense. We conclude that counsel should have filed a motion to suppress.

The issue becomes whether the Petitioner was prejudiced by counsel's failure. Although evidence existed to support a conclusion that the Petitioner was intellectually disabled, the fact of intellectual disability does not, alone, render an individual incapable of making a knowing, voluntary, and intelligent decision to waive his *Miranda* rights and give a statement. *See, e.g.*, *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000); *State v. Bush*, 942 S.W.2d 489, 500-01 (Tenn. 1997). In determining whether the State has established a

knowing, intelligent, and voluntary waiver of rights, the courts view the totality of the circumstances. *Bush*, 942 S.W.2d at 500.

> Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

*Blackstock*, 19 S.W.3d at 208.

Trial counsel testified that the officers who interviewed the Petitioner did not think there was an issue with the Petitioner's ability to waive his rights. The record of the Petitioner's direct appeal reflects that the officers' trial testimony was consistent with counsel's recollection.

Regarding the Petitioner's claim that his statement provided the only evidence he hid the knife before the altercation, the record of the Petitioner's appeal reflects that Ms. Swift testified that when she and friends arrived at her apartment, the victim opened a bedroom closet door and found the Petitioner inside. She went to the living room to call 9-1-1, and she saw the victim and the Petitioner fighting. The Petitioner "retreated to the bedroom and soon returned to the living room armed with a knife." Ms. Carter testified that she had given Ms. Swift a knife set, that she went into the kitchen when she arrived at Ms. Swift's apartment, and that the knives were missing from the drawer. *Anthony Boyland*, slip op. at 3.

We conclude that the evidence does not preponderate against the trial court's conclusion that the Petitioner failed to show prejudice. Trial counsel investigated the case, obtained expert assistance, and determined that the best trial strategy was to challenge the Petitioner's competency. When the court found the Petitioner competent, counsel presented trial evidence related to the circumstances of the Petitioner's waiving his rights and giving a statement and to the question of diminished capacity. The statement provided the Petitioner's version of the relevant events and supported a claim of self-defense without requiring the Petitioner to testify. It was not the only evidence from which the jury could conclude the Petitioner hid a knife before retrieving it and assaulting the victim. We conclude that the trial court did not err in denying post-conviction relief.

## II

The Petitioner contends that even if he is not granted relief for ineffective assistance of counsel, the case should be remanded for a suppression hearing as part of the post-conviction hearing. He argues that this action is appropriate because post-conviction counsel "did not fulfill his statutory duties and duties under Supreme Court Rule 28 when he failed to conduct a suppression hearing at the post-conviction hearing." The State contends that the Petitioner is seeking a second evidentiary hearing on his ineffective assistance of counsel claim, for which there is no legal authority. We agree with the State.

In pertinent part, Tennessee Supreme Court Rule 28 provides:

> Appointed or retained counsel shall be required to review the pro se petition, file an amended petition asserting other claims which petitioner arguably has or a written notice that no amended petition will be filed, interview relevant witnesses, including petitioner and prior counsel, and diligently investigate and present all reasonable claims.

Tenn. Sup. Ct. R. 28, § 6(C)(2). The Petitioner has not cited any authority to support this court's granting the remand he requests, nor has he shown that if such authority existed, he would be entitled to a remand.

As the Petitioner notes, a deficiency in Rule 28 compliance does not entitle a petitioner to a second post-conviction hearing. *See, e.g.*, *Hollis G. Williams v. State*, No. W2006-00779-CCA-MR3-PC, slip op. at 7 (Tenn. Crim. App. June 13, 2007), *perm. app. denied* (Tenn. Nov. 19, 2007), *Richard L. Elliott v. State*, No. M2004-00853-CCA-R3-PC, slip op. at 3 (Tenn. Crim. App. June 3, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). The record does not reflect, in any event, that post-conviction counsel failed to comply with Rule 28. We note that the record of the Petitioner's trial reflects extensive expert proof regarding the Petitioner's mental capacity and intellectual disability. The Petitioner and his mother testified at the post-conviction hearing about these matters. Post-conviction counsel litigated the question of whether trial counsel was ineffective in failing to pursue a motion to suppress, and the trial court ruled on the matter. The Petitioner is not entitled to another hearing in the trial court related to the issue.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE